Michael Millen
Attorney at Law  (#151731)
119 Calle Marguerita  Ste. 100
Los Gatos, CA  95032
Telephone:  (408) 871-0777
Fax:  (408) 516-9861
mikemillen@aol.com

Catherine Short, Esq.
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024
(805) 640-1940

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER B. HOYE, II,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF OAKLAND,<br><br>　　　　Defendant. | NO.:  C07-06411 CRB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

On or about December 18, 2007, the City of Oakland (herein the "City") enacted City of Oakland Municipal Code Chapter 8.50 (consisting of §§8.50.010 et seq.), hereinafter the "original ordinance." The original ordinance imposed various restrictions on First Amendment activity near abortion clinics. One of the restrictions was a facially viewpoint-based restriction prohibiting speech for the purpose of persuading the listener not to access certain reproductive health care services.

On December 19, 2007, Plaintiffs filed this action. Following a hearing on Plaintiff's application for Temporary Restraining Order, the City, through its attorneys, agreed not to enforce the original ordinance and to amend that ordinance. On February 5, 2008, the City amended the ordinance. The amended ordinance ("Ordinance") as applied violates both the federal and state constitutions.

## FACTS

*Background on Plaintiff's Free Speech Activity*

Plaintiff Walter B. Hoye, II is a person who exercises his First Amendment rights on sidewalks and public thoroughfares in front of abortion clinics. Specifically, he goes once a week to the Family Planning Specialists abortion clinic in Oakland and stands on the public sidewalk. He usually holds a sign which states "God loves you & your baby / Let us help you". Hoye Decl. ¶¶1-3.

Plaintiff Hoye does not find himself alone when engaging in his free speech. Typically he is joined by a number of persons (herein called "Escorts") who wear orange vests upon which is inscribed the following writing:

> ESCORT
> Family Planning Specialists
> Medical Clinic

Some of the Escorts carry a piece of blank white posterboard on a stick, free of visible writing. When a third-party walks a path which suggests he or she may be seeking entrance

to the clinic or dropping off such a person from their car, one of the sign-carrying Escorts typically positions their blank posterboard between plaintiff and the third-party thereby blocking the third-party's view of plaintiff's sign. Hoye Decl. ¶¶4-5.

*The Ordinance*

On or about February 5, 2008, the City enacted amended City of Oakland Municipal Code Chapter 8.50 (consisting of §§8.50.010 et seq.) A copy of that ordinance is attached to Request for Judicial Notice ("RJN"), Exhibit A.

Under section 3(b) of the Ordinance, it is unlawful, within 100 feet of the entrance to an abortion clinic, to approach within eight feet of a person or vehicle seeking entry for the purpose of "counseling, harassing or interfering with such person" unless the person or vehicle occupant has given consent. "Harassing" is defined as a non-consensual approach for the purpose of "passing a leaflet or handbill, to display a sign to, or engage in oral protest, education, or counseling with" such other person. RJN, Ex. A, Section 2(c). Violating the Ordinance is a misdemeanor, punishable by imprisonment for up to a year and a fine of up to $2,000.00 or both. RJN, Ex. A, Section 4(a).

*Interpretation of the Ordinance*

On March 14, 2008, plaintiff's counsel Michael Millen sent an email to the Oakland City Attorney's office asking for a copy of any newly issued regulations governing police enforcement of the ordinance. That same day Vicki Laden, Supervising Deputy City Attorney, emailed back: "There aren't any regs. OPD is in the process of drafting a training bulletin, but it hasn't completed one yet. I'm not sure whether training bulletins are public documents but if they are, I'll give it to you as soon as it's issued." Millen Decl. ¶2. At no point has anyone from the City of Oakland transmitted to Mr. Millen any regulations or bulletins regarding enforcement of the Ordinance. Millen Decl. ¶3.

Michael Millen, Esq.
119 Calle Marguerita #100
Los Gatos, CA 95032
(408) 871-0777

**POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND PRELIM. INJ.**

C07-06411 CRB    Page 2

1  Also in March 2008 an Oakland police officer approached plaintiff while he was at
2  the clinic engaging in his free speech activity. The police officer explained that under the
3  Ordinance, plaintiff had a duty to always stay 8 feet away from patients entering the clinic,
4  even if plaintiff was stationary at the time the patient came within 8 feet.  The concept was
5  that there was a bubble around a patient which would force plaintiff to move and back-off
6  even if he were simply standing still at the edge of the sidewalk.  Hoye Decl. ¶6.

7  On March 26, 2008, plaintiff's counsel sent an email to the Oakland City Attorney's
8  office asking for clarification of the police officer's interpretation.  Millen Decl. ¶4.  On
9  April 8, 2008, Vicki Laden, Supervising Deputy City Attorney, emailed back: "I will check
10 into this but I do not think it would be appropriate for me to give you an 'advisory' legal
11 opinion. I am certainly committed to making sure the ordinance is lawfully enforced." The
12 City has never provided any more clarification than this.  *Id*.

14                                    *Events of May 13, 2008*

15 On May 13, 2008, plaintiff was engaged in his customary activity on the public
16 sidewalk in front of Family Planning Specialists abortion clinic in Oakland holding his sign
17 and, when possible, attempting to offer a leaflet to a person entering the clinic. He had been
18 at the clinic approximately two hours, and during that time had seen two women whom he
19 believed might have been patients enter the clinic.  The Escorts stood next to him and held
20 their signs up, effectively barricading plaintiff's person and obscuring the line of sight to
21 plaintiff's sign.  Hoye Decl. ¶7.

22 Shortly after 10:00 AM, three or four police cars arrived. The officers first
23 approached the Escorts who were standing around the doorway of the clinic. One officer
24 asked the other officers to detain plaintiff, which they did.  They asked plaintiff whether he
25 was aware of the eight-foot bubble law. He said that he was. The officer then pulled out
26 some papers and began reading from them.  Plaintiff had seen the Escorts holding and
27 reading from similar-looking papers earlier in the day. The officer told plaintiff that, to

comply with the ordinance, he should not approach *or be within* eight feet of the *escorts*, clinic personnel, or clients. Hoye Decl. ¶8. The police officer's interpretation represented a significant restriction compared to what the police had stated in March 2008. Whereas in March plaintiff was told he needed to always remain 8 feet away from patients, now he was being told that he could not be within 8 feet of the very escorts who dog his steps.

The officers then instructed plaintiff on how to be arrested. They told him to turn around and put his hands behind his head. They patted plaintiff down, handcuffed him, and told him to stand by the police car. Hoye Decl. ¶9.

As he stood by the police car, he observed the police interviewing escorts and clinic personnel. A police officer informed plaintiff that, to comply with the new law, he had to remain 100 feet from the clinic doors if he was going to approach anyone, talk to anyone, or hold a sign or pass out literature that would discourage anyone from getting an abortion. Plaintiff asked if he could be within 100 feet of the clinic wearing a T-shirt that said, "Got Jesus?" and the officer said no. He could only wear clothing that did not display a message. Hoye Decl. ¶10.

This interpretation, given only a few minutes after the last interpretation, represented an even greater restriction on plaintiff's free speech rights as he was now forbidden from carrying a sign within 100 feet of the clinic.

Plaintiff was then asked to sit in the police car. An officer again told him that he could not hold signs or pass out literature within 100 feet of the clinic. The officer suggested that plaintiff measure off 100 feet when the clinic was closed. He also suggested that plaintiff wear a tape recorder, so that if someone approached him, he could say, "I am 100 feet away; please stay eight feet away from me," and this would prove he was trying to comply with the law. Hoye Decl. ¶11.

After taking down his address and having him sign a citation, the police officers again told plaintiff that he needed to stay 100 feet away from the clinic in order to protest

1   without violating the law. He was then released, although the police kept his signs and
2   literature, which they said would be evidence in the case. Hoye Decl. ¶12.
3       Because of this experience, Mr. Hoye does not intend to return to the clinic until he
4   is assured this will not happen again. He testifies that a 100-foot bubble around the clinic is
5   so far away that he cannot effectively communicate with this target audience. He does not
6   want to be arrested for merely being within 100 feet of the clinic with a sign or literature.
7   Also, other persons who were at the clinic for the same reason as he, to offer a pro-life
8   alternative to women, witnessed what happened and are now intimidated from returning to
9   the clinic. Hoye Decl. ¶16.

## ARGUMENT

To be granted a preliminary injunction in the Ninth Circuit, the moving party must show either:

1) A likelihood of success on the merits and the possibility of irreparable harm; or

2) The lawsuit raises serious questions going to the merits and the balance of hardships tips sharply in the movant's favor. *Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991).

The claims of the plaintiff herein amply satisfy either standard.

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

**A. Chapter 8.50 is an unconstitutional restriction on speech in a public forum.**

Public sidewalks are traditional public fora, which for "'time out of mind' . . . have been used for public assembly and debate." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). The identification of public sidewalks with public fora is not merely the "accidental invocation of a 'cliche.'" *Id*. Rather, the Supreme Court has explicitly held that all sidewalks are public fora: "No particularized inquiry into the precise nature of a

specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Id*. at 481.

Governmental bodies may regulate the time, place and manner of speech in traditional public fora, but only if such regulations "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). A content-based exclusion may only be enforced if it serves a compelling government interest and is narrowly drawn to achieve that end. *Id*. Content-based restrictions are "presumptively unconstitutional." *S.O.C. Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th Cir 1998).

### 1. The Ordinance Is Viewpoint-based As Applied.

Viewpoint discrimination is generally an unconstitutional attempt by government to influence public debate and therefore constitutionally forbidden. As the Supreme Court noted in *R.A.V. v. St. Paul*, 505 U.S. 377, 430-31 (1992):

> More particularly to the matter of content-based regulations, we have implicitly distinguished between restrictions on expression based on subject matter and restrictions based on viewpoint, indicating that the latter are particularly pernicious. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S., at 414 . "Viewpoint discrimination is censorship in its purest form," *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 62 (1983) (Brennan, J., dissenting), and requires particular scrutiny, in part because such regulation often indicates a legislative effort to skew public debate on an issue, see, e.g., *Schacht v. United States*, 398 U.S. 58, 63 (1970). "Especially where . . . the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785 -786 (1978).

On May 13, 2008, in the course of arresting plaintiff Hoye, the officers told him that the Ordinance prohibited expressive activity within 100 feet of a clinic entrance that was intended to discourage a person from obtaining an abortion. Hoye Dec. ¶10. The City can assert no compelling state interest to justify the viewpoint-based restrictions in

1  its ordinance and because no such compelling state interest even exists, Chapter 8.50 is
2  unconstitutional as applied and should be enjoined.
3      2. The Ordinance, as applied, is not narrowly tailored to serve significant
4  governmental interests
5      On May 13, in the course of arresting plaintiff Hoye for violation of the
6  Ordinance, police officers told Mr. Hoye that the Ordinance prohibited 1) approaching
7  *or being within* eight feet of clinic escorts, personnel, or patients, and 2) engaging in
8  expressive activity designed to discourage someone from having an abortion, within 100
9  feet of the entrance to an abortion clinic.   Hoye Decl. ¶¶ 6, 8, and 11
10     In *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court repeatedly
11 emphasized that the ordinance at issue was narrowly tailored to serve the asserted
12 governmental interest because it did not force speakers to back away.  The High Court
13 noted that "the 8-foot zone does not affect demonstrators with signs who remain in place
14 . . ." (*Id*. at 726) and that "the statute allows the speaker to remain in one place, and
15 other individuals can pass within eight feet of the protester without causing the protester
16 to violate the statute. . . ." (*Id*. at 727.)   The Court added that "[t]he statute does not,
17 however, prevent a leafletter from simply standing near the path of oncoming
18 pedestrians and proffering his or her material, which the pedestrian can easily accept."
19 (*Id*. at 728.)  Finally, the Court analyzed that  "demonstrators with leaflets might easily
20 stand on the sidewalk at entrances (without blocking the entrance) and, without
21 physically approaching those who are entering the clinic, peacefully hand them leaflets
22 as they pass by." (*Id*. at 729-730.)
23     The Ordinance, as interpreted and applied by the City, prohibits speakers such as
24 Mr. Hoye from simply standing on the sidewalk, if it happens that a clinic escort,
25 employee, or patient passes within eight feet of him. The Ordinance is not narrowly
26 tailored to serve the asserted governmental interest in protecting individuals from being
27 *approached* by unwanted speakers.
28

The second application of the Ordinance as prohibiting all speech activity by pro-lifers within one hundred feet of an abortion clinic is not only blatantly content and viewpoint-based, but also is not narrowly tailored to serve any legitimate, much less significant, governmental interest. Even if the City were to interpret the Ordinance to apply to all speech activity, regardless of content, it would be grossly overbroad in terms of serving the asserted state interests.

<u>3. The Ordinance, as applied, does not leave ample alternative channels of communication</u>.

As interpreted and applied by the City, the Ordinance prohibits all expressive activity by pro-life speakers within 100 feet of an abortion clinic. It also requires speakers to maintain a distance eight feet from patients and others. These restrictions effectively preclude plaintiff from communicating his message to women considering abortion.  Hoye Decl. ¶14.  There are no readily available alternative channels of communication for Plaintiff to reach his intended audience.

**B. The Ordinance is void for vagueness**

The Due Process Clause of both the state and federal constitutions requires that criminal statutes be written in language clear enough to avoid arbitrary enforcement by law enforcement. A statute or ordinance which forbids an act "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process." *Connally v. General Construction Co.* 269 U.S. 385, 391 (1926).

But the evil of vague laws does not stop there.  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

Finally, "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms," because

"[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (internal quotation marks, citations and ellipsis omitted). Therefore, laws which regulate or restrict speech much satisfy "a more stringent vagueness test." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (footnote omitted).

The Ordinance, as interpreted and applied by the City, is unconstitutionally vague. Plaintiff, reading the plain language of the statute, could have no idea that the Ordinance prohibited his activity of standing on the sidewalk, holding a sign and offering literature to women who passed by him. He could have no idea that the Ordinance required him to keep eight feet away from the clinic escorts *who approached him* to block his sign with their signs. He could have no idea that he was not allowed to engage in any pro-life speech activity within 100 feet of the clinic entrance. Indeed, the ever-changing police interpretation of the Ordinance (compare Hoye Decl. ¶6 with ¶8 and with ¶10), combined with the refusal of the City Attorney to give any public guidance concerning the Ordinance's meaning and interpretation (Millen Decl. ¶¶2-4), gives all the hallmarks of an ad hoc law which changes to fit the whim of whatever government enforcement officer happens to be on duty.

II. THE COURT SHOULD ENJOIN ENFORCEMENT OF THE ORDINANCE

The Ordinance strikes at the heart of First Amendment freedoms, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As the Ninth Circuit noted in *Jacobsen v. United States Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir. 1987), "Where the precious First Amendment right of freedom of the press is at issue, the prevention of access to a public forum is, each day, an irreparable injury: the ephemeral opportunity to present one's paper to an interested audience is lost and the next day's opportunity is different." This holding should apply with equal force to

Michael Millen, Esq.
119 Calle Marguerita #100
Los Gatos, CA 95032
(408) 871-0777

**POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND PRELIM. INJ.**

C07-06411 CRB   Page 9

speaking to persons on the public sidewalk and leafletting, which also present only an "ephemeral" opportunity to present a message to a particular audience at a particular time.

### III. THE COURT SHOULD WAIVE BOND

If the court enters a T.R.O and/or preliminary injunction, the court is asked to waive bond under F.R.Civ.P. Rule 65(c). The Ninth Circuit has signaled its approval of nominal bond or waiver of bond requirements where a sole plaintiff seeks to enforce rights in matters of public interest. *See, e.g., Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (approving $1,000 bond and noting with approval a 2nd circuit decision which waived bond). Plaintiffs are seeking to enforce core First Amendment rights which most certainly are matter of public interest and which inure to the benefit of the entire public.

In addition, the City of Oakland will incur no additional expenses if it stops enforcing Section 3(b). By definition, when a City ceases to enforce a criminal ordinance it saves the cost of the police and prosecutorial resources involved. Given that there is no economic risk to the City by being enjoined, the Court is asked to waive bond as allowed by *Barahona-Gomez*. *See also Behymer-Smith v. Coral Acad. of Sci.*, 427 F.Supp.2d 969, 974 (D. Nev. 2006) (district court orders nominal $100 bond in First Amendment case because evidence shows that defendant will suffer little, if any damage, by issuance of injunction).

### CONCLUSION

The court should enter the preliminary injunction as requested.

Dated: May 22, 2008

MICHAEL MILLEN, ESQ.
ATTORNEY FOR PLAINTIFF