1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9               FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   WALTER B. HOYE, II,                          No. C 07-06411 CRB
12            Plaintiff,                          **MEMORANDUM AND ORDER**
13      v.
14   CITY OF OAKLAND,
15            Defendant.
16   _____/
17          Plaintiff Walter Hoye, a pro-life demonstrator, brought suit against Defendant City of
18   Oakland, challenging the constitutionality of Oakland Ordinance No. 12860, which creates
19   an eight-foot buffer zone or "bubble" around people seeking access to reproductive
20   healthcare clinics ("clinics").  Hoye claims that the ordinance is facially unconstitutional,
21   unconstitutional as applied, unconstitutionally vague, and a violation of the Equal Protection
22   Clause.  Now pending before the Court are the parties' cross-motions for summary judgment.
23   For the reasons set forth below, the Court GRANTS Defendant's motion for summary
24   judgment and DENIES Plaintiff's motion for summary judgment.
25   **I. BACKGROUND**
26          In the city of Oakland, California are multiple clinics which provide reproductive
27   healthcare services to women.  Because one of those services is abortion, the clinics have
28   long been the sites of protest over the morality and legality of that medical procedure.
     Though each protest, like each protestor, is different, there is a long history of protests

**United States District Court**
For the Northern District of California

creating significant barriers to patient access at the Oakland clinics.  The executive director

of one clinic described the protests as follows:

> The anti-abortion protestors are so aggressive and invasive, that the [clinic] was
> forced to stop operating on Saturdays due to excessive protesting.  The [clinic] has
> had situations where roughly three hundred protestors showed up to protest the
> clinic's abortion practices.  Patients have had to climb through the back windows and
> fire escapes of the [clinic] to obtain health services, because anti-abortion protestors
> blockaded the front door of the clinic. Comy Decl. at 2.

The executive director of another clinic explained, "Before the Bubble Ordinance was

enacted, I witnessed protestors blocking the way of patients as they tried to enter the clinic. . .

. I have witnessed protestors swarming patient's vehicles . . . thereby preventing the patients

from exiting the car and entering the clinic."  Barbic Decl. at 2.  A security guard at one

clinic for the past three years stated:

> Before the Ordinance was passed, I observed protestors approaching and talking to
> patients . . . I often saw them approach cars and thrust their hands into the car
> windows and doors to hand pamphlets to patients.  I observed the protestors block car
> doors so that patients could not get out of their cars outside the clinic. . . .I have
> observed patients be chased to the front door of the clinic by protestors trying to talk
> to them.  Ali Decl. at 1-2.

Recent protests have varied in number.  <u>See</u> Hoke Decl. at 3 ("I have seen between seven and

forty protestors outside the clinic since the Ordinance was passed"); and Barbic Decl. at 6

("Recently, I have seen between three and forty protestors gathered outside the clinic").

Plaintiff is a pro-life demonstrator in Oakland whose preferred means of pro-life

demonstration is to approach women heading into the clinic and ask, "May I talk with you

about alternatives to the clinic?"  Plaintiff's Mot. at 3. Plaintiff contends that he and some of

his fellow demonstrators do not block sidewalks or clinic entrances, and have never seen a

pro-life demonstrator who has.  Hitchcock Supp. Decl. at 2, Downer Decl. at 2, Kendall

Decl. at 3, Hoye Supp. Decl. at 2.  Accepting Plaintiff's representations as true, not having

seen something does not mean it did or does not occur.  Plaintiff protests outside just one

clinic just once a week.  Hoye Supp. Decl. at 1.  Moreover, Plaintiff concedes that <u>he</u>

sometimes approaches patients' cars, though he disputes the characterization of "mobbing"

the cars or "thrusting [his] literature."  Hoye Supp. Decl. at 2.  The characterization is

United States District Court
For the Northern District of California

subjective; while demonstrators might see nothing aggressive about approaching a patient's car, patients might experience the same action quite differently.

In December 2007, in response to more than ten years of complaints about protest activities at Oakland clinics, City Council member Nancy Nadel introduced the Ordinance. Nadel Decl. at 2.  The City was concerned not only with women's access to the clinics, but also with the trauma and physical distress that demonstrators could cause to patients.  See also Laden Decl. Ex. 4 at 4 (10/23/07 letter to Oakland Public Safety Committee).  The City's goal was to "balance the rights of free speech and expression with the rights of privacy and unimpeded access to health care."  Nadel Decl. at 2.  The City Council held four meetings at which it heard testimony from both pro-choice and pro-life representatives. City's Mot. at 7 and Laden Decl. Exs. 7-10.  Plaintiff was among the pro-life activists who spoke at the meetings, and later said he felt he had a "huge impact" on the City Council. Reding Decl. Ex. 3 at 12.

The original version of the Ordinance was passed in December 2007.  Plaintiff's Request for Jud. Notice, Ex. C.  Plaintiff filed this action that same month, alleging a civil rights violation and seeking injunctive relief.  In a December 2007 hearing on Plaintiff's application for a temporary restraining order, this Court expressed its concern that the Ordinance contained impermissible viewpoint-based language, prohibiting only counseling designed to "persuade [an] individual not to access . . . reproductive health services."  At this Court's strong suggestion, the City agreed to amend the Ordinance by removing that language.  Plaintiff's Mot. at 12.  In February 2008, the City passed the amended Ordinance at issue in this case.  Laden Decl. Ex. 2 at 6.

That amended Ordinance lists the relevant prohibited conduct under the heading of "Prohibited Harassment of Individuals Seeking Access to Health Care Facilities."  Id. at 5. Section 3(a) prohibits "force, threat of force, or physical obstruction" to "injure, harass, intimidate, or interfere with . . . any person because that person . . . is . . . providing or obtaining reproductive healthcare services."  Section 3(b) states: "Within 100 feet of the entrance of a reproductive health care facility, it shall be unlawful to willfully and knowingly

3

**United States District Court**
For the Northern District of California

approach within eight (8) feet of any person seeking to enter such a facility, or any occupied motor vehicle seeking entry, without the consent of such person or vehicle occupant, for the purpose of counseling, harassing, or interfering with such person or vehicle occupant." Id.[1] The Ordinance defines "eight feet" as being measured from "any extension of the body of the individual seeking access" to "any extension of the body of, or any sign or object held by[,] another person." Id. at 4. And it defines "counseling" as "engaging in conversation with, displaying signs to, and/or distributing literature to individuals seeking access to, passage from, or services within the reproductive health care facility." Id.

In May 2008, Plaintiff again sought a temporary restraining order, which the Court denied.[2] In August 2008, the Court denied the City's motion to dismiss. The parties now each seek summary judgment of Plaintiff's claims that the Ordinance is facially unconstitutional, unconstitutional as applied, unconstitutionally vague, and a violation of the Equal Protection Clause. The Court will address each claim in turn.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact issue is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment has the burden to show initially the absence of a

---

[1]There is also a Section 3(c), which prohibits approach within eight feet to injure or intimidate. Id. It is not relevant here.

[2]Plaintiff was arrested on May 13, 2008 for violating the Ordinance on April 29, 2008, when five witnesses saw Plaintiff approach within eight feet of at least eight different patients outside an Oakland clinic to hand them fliers and harass them. City's Mot. at 8. At one point, a clinic director used a measuring tape to show Plaintiff that he was within eight feet of clinic patients. Id. On January 15, 2009, Plaintiff was convicted for violating the Ordinance. Id. That conviction is not the subject of this motion.

genuine issue concerning any material fact.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).  Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial.  See id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630-31 (9th Cir. 1987).

## III. DISCUSSION

1.   Whether the Ordinance is Content- or Viewpoint-Based

A.   *Facial Challenge*

A government may impose reasonable restrictions on time, place, or manner of protected speech, so long as the restrictions "are justified without reference to the content of the regulated speech . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  Plaintiff argues that the Ordinance is content- and viewpoint-based on its face because it was passed with discriminatory intent, is directed only at reproductive healthcare clinics, and restricts "protest, education and counseling" while leaving other speech unrestricted.  Plaintiff's Opp. at 12.[3]  However, the Supreme Court

_____

[3]Plaintiff also argues that there is a genuine issue of material fact as to the need for the Ordinance.  Plaintiff's Opp. at 15-16.  This is not so.  While Plaintiff disputes some of the individual historical facts the City presented in support of the passage of the Ordinance, there is no genuine issue of material fact as to whether there was, on the whole, sufficient evidence of historical access problems. The evidence the City relied on was reasonably believed to be relevant to the problem it addressed.  See Gammoh v. City of La Habra, 395 F.3d 1114, 1126 (9th Cir. 2005); see also McCullen v. Coakley, 2009 WL 1942069 at *6 (1st Cir. 2009) (test for content-neutrality requires only that evidence support legislature's conclusion that regulation serves "a legitimate governmental interest unrelated to

United States District Court
For the Northern District of California

1  upheld the facial content-neutrality of an eight-foot bubble law nearly identical to the

2  Ordinance at issue here.  See Hill v. Colorado, 530 U.S. 703 (2000).  Accordingly, Plaintiff's

3  facial challenge fails.

4       The City has introduced sufficient evidence that the problem it sought to address with

5  the Ordinance was not objectionable speech, but conduct that restricted patients' access to

6  reproductive healthcare clinics.  See, e.g., Laden Decl. Ex. 2 at 2 (Ordinance preamble states

7  that "persons attempting to access reproductive health care facilities . . . have been subject to

8  harassing or intimidating activity from extremely close proximity, tending to hamper or

9  impede their access to those facilities and services").  The Court recalls that the original

10 version of the Ordinance contained viewpoint-based language, but even assuming the illicit

11 legislative motive Plaintiff urges, courts "will not strike down an otherwise constitutional

12 statute on the basis of an alleged illicit legislative motive."  United States v. O'Brien, 391

13 U.S. 367, 383 (1968).  The Court in Hill explained that "the contention that a statute is

14 'viewpoint based' simply because its enactment was motivated by the conduct of the

15 partisans on one side of a debate is without support."  530 U.S. at 724.  See also Menotti v.

16 City of Seattle, 409 F.3d 1113, 1129 (9th Cir. 2005) ("That Order No. 3 predominantly

17 affected protestors with anti-WTO views did not render it content based.").

18      As in Hill, the Ordinance applies "equally to all demonstrators, regardless of

19 viewpoint, and the statutory language makes no reference to the content of the speech."  530

20 U.S. at 719.  And, as in Hill, "the State's interest[] in protecting access . . . [is] unrelated to

21 the content of the demonstrators' speech."  Id. at 719-20.  Indeed, the Court in Hill found that

22 Colorado's statute was "not a regulation of speech" but "a regulation of the places where

23 some speech may occur."  Id. at 719 (internal quotations omitted).  Any speaker was

24 permitted to "attempt to educate unwilling listeners on any subject, but without consent may

25 not approach within eight feet to do so."  Id. at 723.  The same is true here.

26      Plaintiff tries to distinguish Hill because the statute there applied to "any entity that is

27 licensed, certified, or otherwise authorized or permitted by law to administer medical

28

expressive content;" courts must give "significant" respect to legislature's judgment).

United States District Court
For the Northern District of California

treatment in this state," while the Ordinance here is limited to reproductive healthcare clinics. Plaintiff's Mot. at 15.  Hill did comment favorably on the "comprehensiveness" of Colorado's statute.  530 U.S. at 731.  More relevant, however, is the Court's holding that:

> [F]lawed is [the] theory that a statute restricting speech becomes unconstitutionally content based because of its application to the specific locations where that discourse occurs.  A statute prohibiting solicitation in airports that was motivated by the aggressive approaches of Hare Krishnas does not become content based solely because its application is confined to airports– the specific locations where that discourse occurs.  530 U.S. at 724 (internal quotations and citations omitted).

The Ordinance is not unconstitutional simply because it is limited to conduct within 100 feet of the entrance of a reproductive healthcare clinic; the entrances of reproductive healthcare clinics are where discourse about reproductive healthcare often occurs.  See also McGuire v. Reilly, 260 F.3d 36, 44 (1st Cir. 2001) (hereinafter "McGuire I") ("We conclude, without much question, that the Act's stated goals justify its specific application to [reproductive healthcare clinics]").

Plaintiff's argument that the statute is unconstitutional on its face because it restricts "protest, education and counseling," while leaving other types of speech unrestricted, Plaintiff's Mot. at 15, is also unavailing.  Courts have long upheld regulations targeting specific categories of speech as long as they meet the standards for permissible time, place and manner regulations.  See, e.g., Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 380 (1997) (upholding injunction prohibiting "demonstrations" around clinic entrances).

In Hill, as here, the plaintiff complained that "an individual near a health care facility who knowingly approaches a pedestrian to say 'good morning' or to randomly recite lines from a novel would not be subject to the statute's restrictions," and so "[b]ecause the content of the oral statements made by the approaching speaker must sometimes be examined," the statute must be content-based.  Hill, 530 U.S. at 720; see also Plaintiff's Mot. at 16.  The Court dispensed with this argument, explaining,

> It is common in the law to examine the content of a communication to determine the speaker's purpose.  Whether a particular statement constitutes a threat, blackmail, an agreement to fix prices . . . often depends on the precise content of the statement.  We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.  Id. at 721.

The Court explained that while it might sometimes be necessary to examine the content of statements made from within eight feet, "that review need be no more extensive than a determination whether a general prohibition of 'picketing' or 'demonstrating' applies to innocuous speech." Id. While Oakland's Ordinance will sometimes require a police officer to examine the content of speech, that inquiry is permissible under Hill. 530 U.S. at 720-21.

     The Ordinance is content- and viewpoint-neutral on its face.

     Notably, Plaintiff asked this Court at the motion hearing and again in its post-hearing supplemental brief to consider the testimony of Captain Toribio of the Oakland Police Department, in addition to the Ordinance itself, as part of Plaintiff's facial challenge. In making this argument, Plaintiff relied principally on Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 131 (1992), in which the Supreme Court stated that "[i]n evaluating respondent's facial challenge," the Court would "consider the county's authoritative construction of the ordinance, including its own implementation and interpretation of it." But Forsyth does not support Plaintiff's argument. The plaintiff in Forsyth had argued that an ordinance "[did] not prescribe adequate standards" for an administrator setting a permit fee, and so the Court looked to the county's implementation of the ordinance to try to find "narrowly drawn, reasonable and definite standards." 505 U.S. at 130-33.

     The cases relied on by Forsyth demonstrate that courts look beyond the face of a law to its implementation in search of narrowing constructions. See Ward, 491 U.S. at 795-96 ("[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proferred"); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 770 n.11 (1988) ("when a state law has been authoritatively construed so as to render it constitutional, or a . . . practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits . . . . even if the face of the statute might not otherwise suggest the limits imposed"); Gooding v. Wilson, 405 U.S. 518, 524-28 (1972) (finding that nothing had been done to narrow the construction of an overly broad statute). The two Ninth Circuit cases

**United States District Court**
For the Northern District of California

1   Plaintiff cited to in his supplemental brief apply <u>Forsyth</u> in this same context.  <u>See</u> <u>Desert

2   Outdoor Adver. Inc. v. City of Oakland</u>, 506 F.3d 798, 802 (9th Cir. 2007) (noting court's

3   obligation "to interpret a statute, if it is fairly possible, in a manner that renders it

4   constitutionally valid"); <u>Santa Monica Food Not Bombs v. City of Santa Monica</u>, 450 F.3d

5   1022, 1035 (9th Cir. 2006) (discussing "limiting construction" of ordinance).

6   　　Courts search for narrowing constructions because, as the Court explained in <u>Frisby v.

7   Schultz</u>, 487 U.S. 474, 483 (1988), another case Plaintiff relies on, it is a "well-established

8   principle that statutes will be interpreted to avoid constitutional difficulties."   Plaintiff has

9   not directed this Court to any authority in which courts have looked beyond a facially

10  constitutional law to its implementation in order to find it facially unconstitutional.  This

11  Court declines Plaintiff's request that it do so here.  <u>See also</u> <u>McGuire v. Reilly</u>, 386 F.3d 45,

12  58 (1st Cir. 2004) (hereinafter "<u>McGuire II</u>") ("Logically, there is no way (save perhaps

13  when overbreadth is an issue) that an authority's non-binding and non-authoritative

14  interpretation of a facially valid statute can make it more facially constitutionally vulnerable

15  than it would be otherwise"); <u>McCullen v. Coakley</u>, 2009 WL 1942069 at *13 (1st Cir.

16  2009) ("we do not believe that an official's interpretation can render clear statutory language

17  vague so as to make the statute vulnerable to a facial . . . attack").  The City's implementation

18  of the Ordinance, and Capt. Toribio's testimony, are addressed below as part of Plaintiff's as-

19  applied challenge.[4]

20  　　　　　　*B.*　*As-Applied Challenge*

21  　　　　　　i.　　Actions of Clinic Escorts

22  　　Plaintiff argues that the Ordinance is content- and viewpoint-based as

23  applied, because it is enforced in such a way that it prohibits pro-life activists from

24  approaching women to ask if they would like to hear about alternatives to abortion, but

25  allows individuals Plaintiff describes as pro-choice activists to "invite women into the clinic,

26  tell them to disregard Plaintiff's message, and advocate a pro-abortion position."  Plaintiff's

28  　　[4]This is how Plaintiff addressed the matter in his briefing prior to the motion hearing.  <u>See</u>
Plaintiff's Opp. at 16.

9

United States District Court
For the Northern District of California

Mot. at 12-13.  His chief complaint is with the presence and actions of clinic escorts, the volunteers who help patients into the clinics.  The Ordinance recognizes "volunteers who, with the consent of the reproductive health care facility, assist in conducting patients of such facility safely into the facility," along with doctors, nurses and clinic employees, as individuals who "[provide] reproductive health services."  Laden Decl. Ex. 2 at 4.  The Police Training Bulletin interpreting the Ordinance recognizes escorts as well.  Laden Decl. Ex. 6. at 2.  To identify themselves, escorts wear orange vests, which the clinic stores.  Cole Decl. at 1.  The escorts do not work for the clinic, but meet regularly with clinic staff.  Barbic Decl. at 4.  The escorts work on an "as-needed basis," only offering assistance when pro-life protestors are present.  Id.

Plaintiff states that the escorts "will approach [a patient], going right up to within a couple of feet . . . and start talking to her."  Plaintiff's Mot. at 5.[5]  He asserts that the escorts "tell women not to listen to Plaintiff, that he is only there to harass her, that she will only be safe with the escorts, and not to take his literature . . . because it is inaccurate."  Id.  He complains that escorts walk alongside the women, between him and the patients, and either talk to the patients, or "simply make noise to drown out Plaintiff's voice."  Id.  He also states that on some occasions he has seen escorts snatch his literature out of the women's hands.  Hoye Supp. Decl. at 3.  See also Hitchcock Supp. Decl. at 3; Downer Decl. at 3; Kendall Decl. at 3.

As an initial matter, simply facilitating a patient's access to reproductive healthcare services is not pro-choice advocacy.  If it were, the Supreme Court in Hill could not have found that Colorado's bubble statute, which was, among other things, intended to facilitate access, was either content- or viewpoint-neutral.  See 530 U.S. at 725.  If it were, the First Circuit in McGuire I could not have found that Massachusetts's bubble statute, which

---

[5]Barbara Hoke, the escort coordinator, presents a different picture, stating that the escorts "ask for consent to assist the patient into the clinic." Hoke Decl. at 2. She states that the escorts immediately back away if the patients decline their offers of help, that escorts speak softly to avoid intimidating patients, and that if a patient is present, the escorts "do not engage the protestors in conversation." Id. Nevertheless, for the purpose of this Order, the Court will construe all facts in the light most favorable to Plaintiff.

1  explicitly exempted clinic agents and employees, was either content- or viewpoint-neutral.

2  260 F.3d at 46 ("since a primary purpose of the law is to facilitate safe access, the employee

3  exemption serves the basic objectives of the Act").[6]  See also McCullen, 2009 WL 1942069

4  at *7 (finding, as to the Massachusetts law that replaced the law at issue in the McGuire

5  cases, that "exception for persons associated with [reproductive healthcare clinics] remains

6  reasonably related to the legislature's legitimate public safety objectives").  Escorts who

7  simply facilitate access are thus distinct from the hypothetical pro-choice demonstrator

8  imagined by Justice Kennedy in Hill who "chants in praise of the Supreme Court and its

9  abortion decisions."  530 U.S. at 725.

10       Nor does simply facilitating access violate the Ordinance, which forbids the knowing

11  and unconsented approach within eight feet of a patient "for the purpose of counseling,

12  harassing, or interfering."  Laden Decl. Ex. 2 at 5.  Escorts who approach women for the

13  purpose of facilitating their access into a clinic are not approaching "for the purpose of

14  counseling, harassing, or interfering."  This is so even under the Ordinance's broad definition

15  of counseling, which includes "engaging in conversation with."  Id. at 4.  Engaging in

16  conversation with patients is secondary to facilitating access, and allowing escorts to talk to

17  patients for the limited purpose of facilitating patient access is consistent with the

18  Ordinance's purpose.

19       To the extent that escorts deviate from their role of simply facilitating access and

20  engage instead in pro-choice advocacy, they do so in violation of the Ordinance.  In such a

21  scenario, the escorts would be approaching patients "for the purpose of counseling,

22  harassing, or interfering."  See Laden Decl. Ex. 2 at 5.  Plaintiff cannot prevail on his as-

23  applied challenge without first providing proof that this has happened.  Thus the court in

24  McGuire I, 260 F.3d at 47, a facial challenge, invited plaintiffs to return with an as-applied

25  challenge to the Massachusetts bubble statute "if, as the plaintiffs predict, experience shows

26  that clinic staffers in fact are utilizing the exemption as a means either of proselytizing or of

27

28       [6]The Ordinance here has no escort exemption, but does recognize escorts as people who provide reproductive health services and are thus protected under Section 3(a).

1    engaging in preferential pro-choice advocacy."  In their as-applied challenge three years

2    later, McGuire II, 386 F.3d at 50-52, plaintiffs complained of escorts' actions that are

3    remarkably similar to Plaintiff's complaints here: escorts sometimes told patients they did not

4    need to listen to the pro-life protestors, took the pro-life protestors' literature out of patients

5    hands, chattered loudly to drown the pro-life protestors out, and "repeated '[p]ro-abortion

6    rhetoric,' such as 'We have help. We'll help you get inside."  The court found that such

7    actions by the escorts "are not violations of the Act."  Id. at 64-65.

8         Plaintiff has provided no evidence that escorts have ever, as he claims, "advocate[d] a

9    pro-abortion position."  See Plaintiff's Mot. at 12-13.  Of course, the City's declarants say

10   that "escorts do not engage in abortion-related speech when volunteering as escorts," and that

11   escorts "do not counsel patients."  See, e.g., Hoke Decl. at 2; see also Barbic Decl. at 4

12   ("Patients do not consult with escorts about any medical decisions.").  Neither side contends

13   that escorts wear clothing conveying political messages, distribute fliers, or hold signs

14   displaying a message.  Plaintiff's support for this assertion consists simply of the City's

15   alleged lack of an enforcement policy for escorts (discussed below), Barbara Hoke's

16   deposition testimony about Plaintiff's leaflets, given in Plaintiff's criminal trial, and the

17   escort's flexible, self-written guidelines, an exhibit to Hoke's deposition.  Plaintiff's Opp. at

18   17.  The Court declines to take judicial notice of the deposition testimony given by clinic

19   escorts in Plaintiff's criminal trial.  Such testimony is hearsay and does not meet the

20   requirements of the former testimony exception in Federal Rule of Evidence 804(b)(1).

21   There is no evidence that any of the escorts are unavailable, and the City did not have a

22   similar motive to develop the escorts' testimony in Plaintiff's criminal trial as it would in the

23   present case.[7]  Even if the guidelines were admissible evidence, they are not proof that

24   escorts engaged in advocacy.

25        Nevertheless, Plaintiff's proof does go beyond that in McGuire II.  Specifically,

26   Plaintiff states that at times when he has held a sign stating, "Jesus loves you and your baby.

27

28        [7]The Court does take judicial notice of Plaintiff's testimony in his criminal case, as it is a party admission.  Fed. R. Evid. 801(d)(2).

Let us help," escorts have held blank signs in front of it.  Plaintiff's Mot. at 6.  The Court

viewed with great displeasure video clips taken over the course of two days in which escorts

can be seen intermittently walking alongside Plaintiff and blocking Plaintiff's sign with their

own, all-white signs.  See Millen Decl. Ex.D.  Other pro-life demonstrators have also had

their signs blocked.  Hitchcock Supp. Decl. at 2; Kendall Decl. at 2.  While the Court

believes that the escorts are motivated by a desire to minimize patients' distress, the Court

considers it a violation of the Ordinance for escorts to hold signs in front of demonstrators'

signs in a knowing attempt to block demonstrators' messages.  This is so even if the signs the

escorts hold are blank, and even if the escort holding the blank sign is herself more than eight

feet away from a patient, so long as she is working in concert with an escort who is actively

escorting a patient.[8]  The Court notes that this practice appears to have been sporadic, see

Lubin Decl. Ex. 3 (video footage taken from the same days as Plaintiff's video footage,

showing Plaintiff holding sign without being blocked); Hitchcock Supp. Decl. at 2 ("[o]ther

times, they would . . . [block] our signs"); and Cole Decl. Exs. 2 and 3 (photographs from

March 2009 showing unencumbered display of pro-life signs/messages outside Oakland

clinics), and that the City represented at the motion hearing that it has ceased.[9]

ii.      State Action

Despite the evidence that escorts did not always act "as escorts" and

simply facilitate patient access, Plaintiff's as-applied challenge has a fatal flaw.  Just as in

McGuire II, 386 F.3d at 60, what Plaintiff objects to is purely private action, and "[t]he First

Amendment is concerned with government interference, not private jousting in the speech

marketplace."  As the First Circuit explained, "there is no state action if what the plaintiff is

really aiming at are the acts of private persons that are actually illegal under the statutory

_____

[8]Of course, escorts also may not physically block demonstrators; the Ordinance, not the escorts, should protect patients from unconsented approaches within eight feet for improper purposes.

[9]In support of this contention, the City cited to the testimony of escort Lucy Kasdin in Plaintiff's criminal trial.  As already discussed, the Court declines to take judicial notice of such testimony, as it is hearsay.

United States District Court
For the Northern District of California

1  scheme, because then the acts do not reflect the policy of the state." Id.  Plaintiff's fight is

2  with the escorts; he has failed to show unlawful action by the City.

3      Plaintiff must show that although the law is facially neutral, the City is applying it in a

4  viewpoint discriminatory manner.  See id. ("[t]he only challenge they have left in this case is

5  to the way the law has been enforced").  He must show a pattern of unlawful favoritism.  See

6  Thomas v. Chi. Park Dist., 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers

7  (or, more precisely, denying them to disfavored speakers) would of course be

8  unconstitutional, but we think that this abuse must be dealt with if and when a pattern of

9  unlawful favoritism appears.").  Though the clinics have presumably been open for several

10  hundred days since the amended Ordinance was passed in February 2008, Plaintiff points to

11  just two incidents that he claims demonstrate selective enforcement of the Ordinance.

12      First, he argues that Deputy City Attorney Vicki Laden was present at one clinic on

13  April 29, 2008, after which she notified police that Plaintiff had violated the Ordinance that

14  day, but did not mention "that escorts were approaching patients and speaking to them."

15  Plaintiff's Mot. at 10.  Plaintiff does not reveal the contents of the escorts' statements to the

16  patients that day, and there is no indication that the speech constituted pro-choice advocacy,

17  let alone that Laden was aware of such advocacy.  In fact, in the City's responses to

18  Plaintiff's second set of requests for admission, the City explicitly denied that Vicki Laden

19  had witnessed escorts approaching within eight feet of patients without consent for the

20  purpose of engaging them in conversation.  Millen Decl. Ex. H at 4.  The City's actions

21  therefore appear to be consistent with the Ordinance.

22      Second, Plaintiff relates an incident on June 3, 2008 in which demonstrator Virginia

23  Hitchcock witnessed "escorts approaching women heading toward the clinic, without the

24  women's consent, and speaking to them."  Plaintiff's Mot. at 10.  This is the only example

25  Plaintiff provides of pro-life demonstrators calling the police to report the alleged misdeeds

26  of escorts.  Hitchcock and a friend (Mary Arnold) notified the police, who responded and

27  explained that the escorts were not subject to the Ordinance because they are "professionals."

28  Id. at 10-11.  In fact, Hitchcock testified in her deposition simply that "there was a lot of

United States District Court
For the Northern District of California

activity with the escorts and the staff" and that she had not seen anything she thought was illegal.  Reding Decl. Ex .2 at 13.  She also testified that upon arriving, the police "talked to the escorts and the staff," Id. at 14-15, presumably investigating her report.  Plaintiff submitted no evidence that the escorts' speech that day was pro-choice advocacy, or that the police were aware of any such advocacy.  The officer's statement that the escorts are "professionals," as well as Hitchcock's deposition testimony that the police said "it doesn't apply to them," either reflects the police's misstatement of the law (the Ordinance does apply to escorts who are not acting as escorts), or the police's conclusion that the escorts had been acting as escorts.  The latter is at least as reasonable an interpretation, as even Hitchcock had not seen anything she thought was illegal.

Notably, the only evidence in the record that the police were aware that escorts sometimes held blank signs in front of demonstrators' signs is also from the July 3, 2008 incident.  In an email Mary Arnold wrote about the incident, she mentioned that she had told the responding officer that since the ordinance was passed, she had "witnessed one escort . . . hold up a large sign in order to prevent women from reading [Plaintiff's] sign."  Reding Decl. Ex. 1 at 38.  Arnold's email describes the officer as being "pleasant and courteous" and saying, "It's best if a judge decides but I do want the report to be made."  Id.  The record does not reflect whether Arnold ever followed up on this.        Aside from the incidents of April 29, 2008 and June 3, 2008, Plaintiff is forced to argue not about how the Ordinance has been enforced, but about how it might be enforced in the future.  Plaintiff points to the 30(b)(6) testimony of Captain Toribio of the Oakland Police Department, who testified about the City's interpretation of the Ordinance.  Toribio testified that it would not be a violation of the Ordinance for an escort to tell a woman, "It's your right to have an abortion."  Millen Decl. Ex. F at 57.  Toribio agreed that "the City's Enforcement Policy is not to enforce the Bubble Ordinance against escorts acting as escorts."  Millen Decl. Ex. F at 48.  He also said: "if the escort is performing within or doing something within the scope of their duties to facilitate entrance and exit, there are no concerns."  Reding Decl. Ex. 4 at 14-15.

15

United States District Court
For the Northern District of California

It is consistent with both the Ordinance and <u>Hill</u> not to enforce the Ordinance against escorts who are "acting as escorts"– that is, escorts who are simply facilitating patient access. However, the Court finds that, provided the other requirements of Section 3(b) were met, Capt. Toribio was wrong when he testified that it would not violate the Ordinance for an escort to tell a patient, "It's your right to have an abortion."  <u>See</u> Millen Decl. Ex. F at 57. While such a statement arguably facilitates access, it goes beyond that narrow function and may constitute "counseling" under the Ordinance. <u>See</u> Laden Decl. Ex. 2 at 5.[10]  Toribio's testimony was given in response to a question which Defendant's counsel objected to as speculative and an incomplete hypothetical.  Certainly it was that (an escort could permissibly tell a woman it was her right to have an abortion if the two were standing in line at a supermarket across town from a clinic), but more importantly, it is not evidence that escorts make such statements, or that the police turn a blind eye to them.  An answer to a hypothetical is not evidence that discrimination has occurred. <u>See, e.g.</u>, <u>Boyd v. City of Oakland</u>, 458 F. Supp. 2d 1015, 1043 (N.D. Cal. 2006) (police captain's conjectural responses to hypothetical questions did not constitute admissible evidence of discrimination). As in <u>McGuire II</u>, "there is no evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiff[]."  386 F.3d at 65.

Plaintiff has provided no evidence that the police have targeted pro-life demonstrators. <u>Compare</u> <u>Menotti</u>, 409 F.3d at 1148 (finding genuine issue of material fact as to whether police were unfairly targeting only anti-WTO protestors).  He claims that no clinic escort having been arrested or prosecuted for violating the Ordinance is evidence of disparate enforcement.  Plaintiff's Mot. at 11.  Of course it is not, barring any evidence that escorts violated the Ordinance and that police were aware of it.  Moreover, the only arrest Plaintiff cites to of a pro-life demonstrator under the Ordinance is his own, following repeated

---

[10]Escorts may of course say such things as: "would you like help getting into the clinic," "the clinic is this way," "you can follow me to the clinic," and "the clinic opens in 10 minutes."  The distinction between these statements and "it's your right to have an abortion" is that the latter purports to advise the woman about her rights and arguably addresses not only her access to the clinic but what she could or should do once inside it.

16

**United States District Court**
For the Northern District of California

violations.  City's Mot. at 22.  In fact, Plaintiff testified that the police have "been great, actually . . . . they[] hear our side of it, their side of it."  See Reding Decl. Ex. 3 at 14-15. Plaintiff has not demonstrated a pattern of selective enforcement.  See Brown v. City of Pittsburgh, 543 F. Supp. 2d 448, 486 (W.D. Penn. 2008) (holding that plaintiff failed to show a pattern of unlawful behavior based on two incidents of police enforcement of city bubble ordinance).

Plaintiff has failed to demonstrate that the City is enforcing the Ordinance in a discriminatory manner; the Ordinance is content- and viewpoint-neutral as applied to Plaintiff.

> 2.    Whether the Ordinance is Narrowly Tailored to Serve the Asserted Governmental Interest

The Ordinance must also be narrowly tailored to serve a significant government interest.  Ward, 491 U.S. at 791.  Plaintiff argues that protecting women's access to reproductive healthcare clinics is not a significant interest, and that the City has not justified the Ordinance.  Plaintiff's Mot. at 23-24.  Plaintiff characterizes Madsen v. Women's Health Ctr., Inc., 512 U.S. 753 (1994) as having found that "the interest in protecting access to an abortion clinic did not justify a restriction on unconsented approaches."  Id. at 24.  But the Court in Madsen cited approvingly a Florida Supreme Court holding that "the State has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy," and found that interest and other relevant interests "quite sufficient to justify an appropriately tailored injunction to protect them."  512 U.S. at 767-68.  That the Court went on to find that a prohibition of any unconsented approach within 300 feet of a clinic was not narrowly tailored,  Id. at 760, 773-74, is not dispositive here, where the Ordinance only prohibits approaches within eight feet of patients who are within 100 feet of a clinic entrance.  Laden Decl. Ex. 2 at 5.

Moreover, the Court in Hill acknowledged that the state's interest in protecting the health and safety of its citizens "may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests."  530 U.S. at 715.  The Court went on to hold:

**United States District Court**
For the Northern District of California

1  Persons who are attempting to enter health care facilities– for any purpose– are often
2  in particularly vulnerable physical and emotional conditions.  The State of Colorado
   has responded to its substantial and legitimate interest in protecting these persons
3  from unwanted encounters, confrontations, and even assaults by enacting an
   exceedingly modest restriction on the speakers' ability to approach.  Id. at 729.

4  The City enacted the Ordinance in response to more than ten years' of complaints

5  about protest activities at Oakland clinics, following four separate meetings at which it heard

6  testimony from both pro-choice and pro-life representatives, and having concluded that

7  "existing federal and state laws do not adequately protect the rights of those seeking or

8  providing reproductive health care services."[11]  Laden Decl. Ex. 2 at 3.  See Nadel Decl. at 2;

9  City's Mot. at 7; Laden Decl. Exs. 7-10.  The City's interests in protecting women's access

10  to reproductive healthcare clinics is thus both justified and "substantial and legitimate" under

11  Hill.

12  Plaintiff also asserts that the Ordinance is not narrowly tailored to restrict only

13  unwanted approaches.  Plaintiff's Mot. at 25-29.  He urges a reading of Hill in which the

14  Court "did not understand the statute to prohibit the speaker from approaching in the absence

15  of the person taking some action to prevent that approach."  Plaintiff's Mot. at 26.  This

16  reading is incorrect.  The bubble statute in Hill also expressly prohibiting approach without

17  consent.  530 U.S. at 708 n.1.

18  Plaintiff urges that the Ordinance is not narrowly tailored to prohibit unconsented

19  approaches, but all approaches, due to "the layout of the sidewalk and street surrounding the

20  clinic" and the limited window he has to reach patients who are dropped off in front of the

21  clinic.  Plaintiff's Mot. at 27-28.  He claims a "necessity of approaching significantly closer

22  than eight feet in order to communicate with women seeking to enter the clinic."  Id. at 28.

23  This argument also fails, as Hill approved an eight-foot bubble ordinance without limitation

24  to particular physical settings.  530 U.S. at 703.  Just as in Menotti, 409 F.3d at 1133-34,

25  

26  _____

   [11]See also Laden Decl. Ex. 4 at 5-6 (10/23/07 letter to Oakland Public Safety Committee,
27  explaining among other things that California's FACE law does not prohibit harassing or counseling
   as defined in the Ordinance and does not establish a zone of protection around an individual); and Hill,
28  530 U.S. at 729 ("the statute's prophylactic aspect is justified by the great difficulty of protecting, say,
   a pregnant woman from physical harassment with legal rules that focus exclusively on the individual
   impact of each instance of behavior.").

where the Ninth Circuit found that an order "covered only enough territory for the WTO delegates and the President to move safely from their hotels to the [WTO] convention and lasted only during the conference," the Ordinance is narrowly tailored to only limit approaches within eight-feet of people entering the clinic, thus allowing safe access.  See also McCullen, 2009 WL 1942069 at *7-11 (finding that law establishing a 35-foot buffer zone around reproductive healthcare clinics was narrowly tailored).  The Court also notes that while Plaintiff appears to take a relatively mild-mannered approach to demonstrating, the Ordinance must take into account that not all demonstrators or potential demonstrators are Plaintiff.  The Ordinance is narrowly tailored.

> **3.**      Whether the Ordinance Leaves Open Ample Alternative Channels of Communication

A content-neutral time, place and manner restriction that is narrowly tailored to serve a significant government interest must also leave open ample alternative means of communication.  Ward, 491 U.S. at 798.  Plaintiff argues that while the Court in Hill, a facial challenge, found that "[s]igns, pictures, and voice itself can cross an 8-foot gap with ease," 530 U.S. at 729, they cannot so easily reach patients in Oakland.  Plaintiff's Mot. at 17-18.  Plaintiff complains of the escorts blocking his sign, standing between him and patients, and making noise to drown out his voice.  Id. at 18.  He complains about the City's enforcement policy, which he claims bars him from standing still and lifting his arm to hand a patient a leaflet.  Id. at 19.  And he complains that the City's enforcement policy permits an escort to essentially veto a patient's consent to Plaintiff's approach.  Id. at 20.  Plaintiff also argues that the eight-foot bubble makes it "virtually impossible to start up a conversation with someone from eight feet away," and that there "is no substitute or 'ample alternative' to approaching . . . a person . . . to strike up a conversation."  Id. at 22.  Plaintiff testified that being required to stay eight feet away from the patients "just wouldn't seem natural" and "would seem impolite."  Reding Decl. Ex. 3, at 6.  Plaintiff also complains that "the brief period of time to speak to women entering the clinic is insufficient to ask for consent to approach" since many women are dropped off just outside the clinic.  Plaintiff's Mot. at 3-4.

1    Addressing these concerns in reverse order, while Plaintiff might prefer to express

2    himself by striking up a polite conversation with patients from a close distance, "the First

3    Amendment does not guarantee the right to communicate one's views . . . in any manner that

4    may be desired." <u>Menotti</u>, 409 F.3d at 1138 (internal citations omitted).  Plaintiff has no

5    right to communicate at a polite (i.e., close) distance.  <u>See</u> <u>Colacurcio v. City of Kent</u>, 163

6    F.3d 545, 548 (9th Cir. 1998) (rejecting argument that because "table-dancing" is a "unique

7    form of expression," ten-foot distance requirement amounts to a complete ban on a unique

8    form of expression); <u>McCullen</u>, 2009 WL 1942069 at *9 ("the Constitution neither

9    recognizes nor gives special protection to any particular conversational distance").

10    Nothing in the Ordinance prevents Plaintiff from approaching within eight feet of an

11    escort for the purpose of communicating with a patient.  Section 3(b) provides that "it shall

12    be unlawful to willfully and knowingly approach within eight (8) feet of any person seeking

13    to enter such a facility. . . without the consent of <u>such person</u> . . . for the purpose of

14    counseling, harassing, or interfering with <u>such person</u>."  <u>See</u> Laden Decl. Ex. 2 at 5

15    (emphasis added).  However, under Section 3(a), one may not use force, threat of force, or

16    physical obstruction– at any distance– to harass any person providing reproductive health

17    services, including escorts. <u>Id.</u>  This is consistent with the Training Bulletin, which identifies

18    escorts on its list of protected individuals.  Laden Decl. Ex. 6 at 2.  It is also consistent with

19    <u>Hill</u>.  530 U.S. at 708 n.1 (ordinance prohibited unconsented approach of "another person,"

20    not limited to patients).  Nothing prevents a demonstrator from approaching within eight feet

21    of an escort if the approach is not to harass "that person" but to communicate with a patient

22    eight feet away.

23    Next, nothing in the Ordinance prevents a demonstrator from leafleting, provided the

24    demonstrator is eight feet away from an unconsenting patient.  The Ordinance defines "eight

25    feet" as measured from any extension of the body.  Laden Decl. Ex. 2 at 4.  The City's

26    Training Bulletin is consistent with this.  Laden Decl. Ex. 6 at 3.  Capt. Toribio's testimony,

27    Millen Decl. Ex. F at 84, that a demonstrator who stands still but lifts his arm toward a

28    patient is "approaching" that patient, is consistent with the Ordinance; provided the

**United States District Court**
For the Northern District of California

demonstrator's outstretched arm is eight feet from the patient, that is not a violation.  As in Hill, nothing in the Ordinance prevents a leafletter "from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept."  See 530 U.S. at 727.

Most importantly, while Plaintiff does not have all of his preferred channels of communication open to him, he still has ample alternative channels.  He can speak to patients from eight feet away without their consent, from within eight feet with their consent, or from within eight feet regardless of consent beyond 100 feet of clinic entrances.[12]  The Court in Hill held that eight feet "allows the speaker to communicate at a 'normal conversational distance,'" and, though Hill was a facial challenge, the Court imagined that there might be background noise and other speakers competing for patients' attention.  530 U.S. at 726-27.

Indeed, Plaintiff admits that he "has had some success in engaging in conversation" – his preferred means of expression– "with patients since the Ordinance passed," though he hastens to add that "his successes were 'many more' before the Ordinance."  Plaintiff's Opp. at 9.  As already discussed, while there is evidence that escorts sometimes held signs in front of Plaintiff's sign, this practice appears to have happened only sporadically.  As in Hill, the Ordinance places no limitations on signs' "number, size, text or images," or on "the number of speakers or the noise level" of oral protest.  530 U.S. at 726.

The evidence shows that pro-life demonstrators continue to get their message across.  See, e.g., Hoke Decl. at 3-4 ("The protestors are impossible to miss. . . . I have observed the protestors holding large signs . . . . I have seen a pickup truck with pro-life stickers parked across the street. . . . The protestors are very loud.  They sing songs, pray, and pass out fliers."); Barbic Decl. at 6 ("I have seen . . . protestors carry large signs that can be read from across the street.  They pass out pamphlets.  The protestors sing and pray.  Their voices easily carry across the street and can be heard inside and outside the clinic."); and Quan

---

[12]The Court notes that Plaintiff argued at the motion hearing that the Ordinance creates a "super-escort privilege" by taking the eight-foot bubble from Hill and applying it within 100 feet from the clinic's entrance.  But the statute in Hill also dealt with an eight-foot bubble that operated within 100 feet of a facility's entrance.  530 U.S. at 708 n.1.  The Court characterized that statute as "an exceedingly modest restriction on the speakers' ability to approach."  Id. at 729.

Decl. Exs. 1 and 2 (photographs of pro-life protestors gathered outside Oakland clinic in March 2009). This is sufficient. See Menotti, 409 F.3d at 1138 ("Given the protestors' ability to communicate directly across the street from most WTO venues, and given the violence that Order No. 3 was aimed at preventing, we think the better analysis favors the conclusion that Order No. 3 provided ample alternatives for communication."); McCullen, 2009 WL 1942069 at *9 (finding ample alternative channels of communication where law provided for 35-foot buffer zone around reproductive healthcare facilities, because demonstrators "can speak, gesticulate, wear screen-printed T-shirts, display signs, use loudspeakers, and engage in the whole gamut of lawful expressive activities" from 35-feet away).[13]

4.      Whether the Ordinance is Unconstitutionally Vague As Applied

Plaintiff next argues that the Ordinance is unconstitutionally vague as applied. Plaintiff's Mot. at 29. A statute is vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." Hill, 530 U.S. at 732.

Some of Plaintiff's concerns are plainly without merit. There is nothing unconstitutionally vague about "vehicle[s] seeking entry" to the clinic. See Laden Decl. Ex. 2 at 5. As vehicles cannot drive into clinic waiting rooms, the term is properly interpreted as vehicles pulling up to the clinic's parking lot or curb. Similarly, while "approach" is not defined in the Ordinance, its definition in the Training Bulletin ("to come near or nearer to") is the common definition. See id., Laden Decl. Ex 6 at 4. That a demonstrator who stands still but lifts his arm toward a patient is considered to be "approaching" that patient is both logical and consistent with the Ordinance's measurement of eight feet "from any extension of

_____

[13]The Court rejects the argument in Plaintiff's supplemental brief that Edwards v. City of Coeur D'Alene, 262 F.3d 856, 866-67 (9th Cir. 2001) shows that the Ninth Circuit takes a more jealous view of the "ample alternatives" prong than does the First Circuit. Plaintiff's Supp. Brief at 3-4. The Ninth Circuit in Edwards struck down a ban on the use of wooden sticks to hold up signs carried during parades and assemblies, but did so because at "mass gatherings," "it is often difficult to see more than a few feet in any direction, or to hear anyone who isn't standing nearby." 262 F.3d at 867. Plaintiff has not demonstrated that an eight-foot bubble outside clinic entrances presents the same obstacles to communication as a crowded parade.

United States District Court
For the Northern District of California

the body." Laden Decl. Ex. 2 at 4. See also Hill, 530 U.S. at 733. Also "consent," though undefined in the Ordinance, is certainly clear; "[t]he likelihood that anyone would not understand [such a] common word[] seems quite remote." See id. at 732.

Plaintiff accurately notes that while Section 3(b) of the Ordinance refers to persons "seeking to enter" a clinic, the Training Bulletin states (and Capt. Toribio testified) that the Ordinance is interpreted to include persons both entering and exiting. Plaintiff's Mot. at 30. The omission does not render the Ordinance unconstitutionally vague. The Ordinance defines "interfering," prohibited by Section 3(b), to include "access" and "egress," and defines "counseling," prohibited by Section 3(b), to include persons "seeking access to" or "passage from" clinics. Laden Decl. Ex. 2 at 4 and 5. It also defines "eight feet," the distance identified in Section 3(b), as relating to a person "seeking access to" or "passage from" a clinic. Id. Thus a person of ordinary intelligence would understand that, as in Hill, 530 U.S. at 708 n.1, the ordinance "as a whole" prohibits interference with persons both entering and exiting clinics. See Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).

Plaintiff complains again that it is unclear under the Ordinance whether he can approach within eight feet of an escort walking with a patient when his intent is only to communicate with the patient, and whether he can approach within eight feet of an escort standing alone in front of the clinic. Plaintiff's Mot. at 31-32. As already discussed, the Ordinance does not prevent a demonstrator from approaching within eight feet of an escort– standing or walking– if the approach is not to harass "that person" but to communicate with someone else eight feet away.

A closer question is what kind of communication is permissible under the Ordinance between a demonstrator and an unconsenting escort (or patient) within eight feet. Plaintiff's Mot. at 31. Plaintiff disputes the City's assertion that a demonstrator could approach an escort to talk about the Super Bowl "because the protestor would not be harassing the escort," noting that "the City overlooks its own extremely broad definition of 'harassing.'" Plaintiff's Reply Brief at 14. Indeed the City's definition of harassing includes "counseling,"

23

and its definition of "counseling" includes "engaging in conversation with."  Laden Decl. Ex. 2 at 4.

This raises a legitimate concern about overbreadth, but it is not fatal.  First, the court in Hill, 530 U.S. at 732, found in reference to Colorado's statute that "protest, education, or counseling" were common words, and that it seemed "quite remote" that anyone would not understand them.  Sections 3(a) and 3(b) fall under the heading of "Prohibited Harassment," and the Ordinance's preamble states that "persons desiring or needing access to [reproductive health care services] should not be intimidated, hampered, impeded, harassed, or restrained from obtaining those services."  Laden Decl. Ex. 2 at 2, 5.  It is clear that, as a whole, the Ordinance prohibits interference with access, not casual conversation about the Super Bowl. See Grayned, 408 U.S. at 110; and Hill, 530 U.S. at 740 (Souter, J. concurring) ("Someone planning to spread a message by accosting strangers is likely to understand the statute's application to 'education.'").  Second, as in Hill, 530 U.S. at 732, Oakland's Ordinance contains a scienter requirement that should ameliorate any concern that persons of ordinary intelligence would be trapped by arguably vague language.  See Laden Decl. Ex. 2 at 5. Third, as in Thomas, 534 U.S. at 324-325, where Plaintiffs complained that the criteria in the ordinance was "insufficiently precise," any abuse in enforcement is better addressed "if and when a pattern of unlawful favoritism appears."  See also Grayned, 408 U.S. at 110 ("condemned to the use of words, we can never expect mathematical certainty from our language") and Ward, 491 U.S. at 794 ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

Accordingly, the Ordinance is not unconstitutionally vague.

### 5.  Whether the Ordinance Violates the Equal Protection Clause

Plaintiff's final argument, that the Ordinance violates the Equal Protection Clause, rests on his contention that "the Ordinance allows speech or speakers favoring abortion greater latitude than the speech or speakers favoring alternatives to abortion."  Plaintiff's Opp. at 25.  Arguing that the Ordinance impinges on a fundamental right (speech),  Plaintiff urges the Court to apply strict scrutiny.  Plaintiff's Mot. at 33-34.  This argument also fails.

24

The Court has already found that the Ordinance is content- and viewpoint-neutral. Strict scrutiny is "inappropriate where a law regulating speech is content-neutral, even where the speech at issue was non-commercial." Maldonado v. Morales, 556 F.3d 1037, 1048 (9th Cir. 2009). "At most" the Ordinance needs to survive an intermediate level of scrutiny. See id. The Ordinance is substantially related to an important government objective: the Court in Hill, 530 U.S. at 729, found that protecting access to healthcare is both substantial and legitimate. The Ordinance thus "easily passes the necessary scrutiny to overcome [Plaintiff's] equal protection challenge." See Maldonado, 556 F.3d at 1048. The First Circuit reached the same conclusion in McGuire I, 260 F.3d at 50, holding that "the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment."

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 4, 2009

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE